## AMERICAN CHEMICAL PAINT CO. v. REILLY TAR & CHEMICAL CORPORATION.

### No. 6877.

Circuit Court of Appeals, Seventh Circuit.
March 8, 1940.

Hood & Hahn, of Indianapolis, Ind. (W. P. Hahn, of Indianapolis, Ind., and Harvey Lechner and Arthur Synnestvedt, both of Philadelphia, Pa., of counsel), for appellant.

Schley & Trask, of Indianapolis, Ind. (George B. Schley, and Verne A. Trask, both of Indianapolis, Ind., of counsel), for appellee.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

The decree which caused this appeal was based upon the court's finding that both claims of the patent to Gravell and Douty, No. 1,796,839, covering "Material for Selectively Controlling Metal Pickling Baths" issued March 17, 1931, though valid, were not infringed.

While the claims of the patent covered metal pickling baths and defendant makes only inhibitors[*], contributory infringement is asserted because the inhibitors were made for, intended for, and used in connection with, metal pickling baths of the kind covered by the patent.

The story of the art of making steel and like metals is quite as interesting as the history of other industrial products which have been touched and made to serve by the magic hand of science.

Plaintiff's assignors' invention deals with one of the many steps which have necessitated scientific research to ascertain the best solution of a step in manufacture of steel and iron products. In the fabrication of iron and steel articles such as sheets, bars, rods, and wires, scales are prone to form on the surface of the metal. They must be removed. Otherwise injurious effects follow, and the product is lessened in both intrinsic and market value.

The inhibitor is introduced into the pickling bath to prevent the metal deterioration. A better term than "inhibitor" would perhaps be "neutralizer."

This scale removal is more or less successfully attained by suspending or immersing metals at various stages during the course of their fabrication in what is called a pickling bath. This process has long been used. Plaintiff's patent deals with a particular formula and does not attempt to cover the broad field of pickling baths.

One type of a pickling bath is a dilute solution of sulphuric acid and water. It is contained in a large trough-like tank and when in operation is maintained at a temperature of around 180 degrees Fahrenheit. Unfortunately, the acid of this pickling bath while removing the scales from the metal, also to a certain degree, attacks the metal itself. The sound metal thus impaired or destroyed represents a dead loss and its destruction also involves a useless consumption of the acid. It was to overcome this difficulty that the patent herein was aimed.

Patentees used thiocyanate in the bath to minimize the attack of the acid on the sound metal. The two claims of their patent read:

"1. A pickling bath for metal comprising an admixture of water, acid and a thiocyanate.

"2. A pickling bath for metal comprising an admixture of water, acid, and ammonium thiocyanate."

---

[*] An inhibitor is a material used in a bath to prevent the acid from impairing the integrity of the metal.

For a statement of the existing art and the problems and their solution, we chose patentees' own words:

"We have practiced pickling according to the method described in U. S. Patent No. 288,150 and we have noted that the results are beneficial, but there are numerous disadvantages which limit the utility of that method. We have found that the addition of potassium cyanide to the pickling baths not only prevents acid brittleness, but also tends to cause the action to be selective, in that after the scale is removed the metal is protected to a great extent against the action of the acid. But to offset these advantages, the work is discolored, poisonous gas escapes from the bath and the desirable action of the potassium cyanide is not lasting.

"It occurred to us that an improvement might be effected by adding the potassium cyanide in small increments and although this prolonged the life of the cyanide it did not overcome the discoloration of the work or the escape of poisonous fumes.

"We have discovered that if we replaced the potassium cyanide by a substance that would react with the nascent hydrogen, developed by the reaction between the acid bath and the metal being pickled, to liberate the hydrocyanic acid within the bath, new and surprising results were obtained, the bath ceased to stain the work or to liberate a noticeable or objectionable amount of poisonous fumes, and a very small quantity of the added substance produced a powerful and lasting effect in selectively controlling the bath, in that after the oxide or scale was removed from the work, the corrosive effect of the bath on the work was materially reduced or checked.

"* * *

"We have found, as a class, that the thiocyanates react well with nascent hydrogen to furnish hydrocyanic acid within the pickling bath. Among these we prefer to use ammonium thiocyanate due to its commercial availability.

"* * *

"It should be noted that although we have specified certain quantities of the ingredients in relation to the size of the pickling solution, the proportions of water, acid, control material and foaming agent may be varied through a great range without deviating from the spirit of this invention, as the effect produced by each ingredient may be increased or diminished by varying its concentration, as individual tastes will dictate."

From this brief statement it will be seen that the invention was of a pickling bath, whereas the alleged infringer only made a product with the intention that it be used in the pickling bath.

Defendant claims its inhibitor follows the teachings of the Cunningham patent (No. 1,961,096) under which it is licensed.

Its product contains equal parts by volume of concentrated hydrochloric acid and coal tar bases (ninety-six parts of this mixture) and four parts of ammonium thiocyanate. Each of the starting materials is old.

One of the vital questions arises out of the alleged chemical action which takes place following the admixture of the elements in defendant's product. Plaintiff contends that the product remains a mere mixture of its starting materials and its increased inhibitive power (much greater than that of any of its starting materials) is due to synergism, here used to describe a co-operative action by which the joint effect of two substances is greater than the sum of their individual effects.

Defendant, on the other hand, contends that its product (Reilly 22) does not remain a mixture of the starting materials, but that the ammonium thiocyanate reacts with the hydrochloric acid to form ammonium chloride and thiocyanic acid, and the thiocyanic acid thus formed reacts with the coal tar bases to form a complex reaction product, and that the inhibiting power of its Reilly 22 (defendant's commercial inhibitor) is due to this complex reaction product, the exact nature of which is unknown.

Upon the entire evidence, the court found the "exact nature of Reilly 22 is not known; but it is highly probable that its active inhibiting ingredient is a mixture of new compounds—a reaction product formed in the reaction of ammonium thiocyanate with coal-tar base hydrochlorides."

Our legal problem may be stated thus: Where one element in a patentable combination may be described as X (ammonium thiocyanate) and the infringing element XYZ is a compound, under what, if any, circumstances may there be an avoidance of infringement? It would seem that unless two of the ingredients (Y and Z)

in the XYZ compound are innocuous there is no infringement,—unless we can say that XYZ should be held to be the equivalent of X in such a patented combination.

' Of course, defendant would not be permitted to add two factors like Y and Z if neither one has any effect on X or on the acid in the pickling bath. Likewise, Y and Z might have effect and still not be such as to prevent a court's holding XYZ to be the equivalent of X in a patented combination, wherein both X and XYZ are introduced to serve a certain specific purpose.

.· Our question then narrows to this: Is XYZ the equivalent of X in this case? This question is asked and answered on the assumption that X is ammonium thiocyanate and XYZ is concentrated hydrochloric acid, coal tar, and ammonium thiocyanate.

There is much testimony which supports Judge Baltzell's finding that XYZ is not the equivalent of X.

In fact, we might say the testimony would be contrary to any other finding. The tests made establish chemical action between the three ingredients which makes XYZ far more effective an inhibitor than X. Moreover, there is evidence which indicates that X ceases to exist as X after chemical action with Y and Z. Finally, there is evidence to the effect that the result of XYZ as the inhibitor in the bath is different from the effect of X as an inhibitor in the same bath.

The issues, of necessity, are determined largely by the testimony of expert witnesses. A background of common knowledge and common experience is not present to help the court weigh the testimony. For example, the effect of ammonium thiocyanate in a pickling bath,—the character of the chemical reaction which occurs in ammonium thiocyanate when hydrochloric acid is added 'and how thiocyanic acid thus formed reacts upon the coal tar, are all beyond the ken of some, if not most, of the judges.

Our question is nevertheless a factual one and of necessity the court must weigh the testimony the same as it does when confronted by an issue involving mental competency, negligence, criminal intent, failure of electrical appliances to meet warranties, etc. We are not prevented from analyzing the testimony because technical problems are set forth in hard-to-understand words. The question is still the same,—one of fact and weight of testimony. Is there substantial evidence to support the District Court's finding? Does the evidence show defendant's inhibitor to be the equivalent (in patent parlance) of the one plaintiff described in the patent?

Nor could a non-technical man expect to possess dependable information as to the soundness of the assertion that proof of the presence of ammonium and of thiocyanate in Reilly 22 is proof that Reilly 22 contains ammonium thiocyanate. Nor can we on the basis of our knowledge accept defendant's contention that while Reilly 22 does contain ammonium ($NH_4$) and thiocyanate (SCN), which if combined would make ammonium thiocyanate ($NH_4$-SCN), it (Reilly 22) also had other combining properties. From the hydrochloric acid used in its preparation it· would possess chloride (Cl) which might combine with ammonium ($NH_4$) to form ammonium chloride ($NH_4Cl$), and from the coal tar bases it has relatively complex base entities which could combine with the thiocyanate to form the reaction product which the court regarded as being the active inhibiting ingredient of Reilly 22.

It is interesting to note in this respect that one expert witness testified that whether the ammonium in Reilly 22 combined with the thiocyanate or with the chloride and whether the coal tar bases are combined with the hydrochloric acid or with the thiocyanate could not be determined in any conceivable way.

Based on the comparison of the results of a test made for this case, it would seem that the defendant's elements did not unite in Reilly 22 to make ammonium thiocyanate. At least, it would seem more natural to assume the acid reactions to be different in Reilly 22 than to accept syner-. gistic action as an explanation of defendant's results as shown by this test.

The court's findings, made after much of the testimony on the trial was directed to this issue, are entitled to weight, and as we view it after an independent study, they are strongly supported by the evidence. The court found:

"14. The exact nature of Reilly 22 is not known; but it is highly probable that its active inhibiting ingredient is a mixture of new compounds—a reaction product formed in the reaction of ammonium

thiocyanate with coal-tar base hydrochlorides.

"15. The evidence fails to establish the presence in Reilly 22, or in a pickling bath using Reilly 22, of ammonium thiocyanate or of any other thiocyanate within the scope of the patent in suit in any significant quantity."

We are satisfied that these two findings reflect the facts as disclosed by the evidence in this case.

There are other defenses raised which go to the validity of the patent. We need not consider them. It is unnecessary to determine the validity of either claim and we are not expressing any opinion thereon. It is sufficient to affirm the decree on the sole ground of noninfringement.

The decree is affirmed.